UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ICI BENEFITS CONSORTIUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00603-JPH-MG |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF LABOR, | ) | |
| Julie Su, *in her official* | ) | |
| *capacity as Acting Secretary of the* | ) | |
| *United States Department of Labor,* and | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Plaintiff, ICI Benefits Consortium (the "Consortium"), by counsel, respectfully

submits its Response Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's

Complaint.

## INTRODUCTION

The government's "Legal Background" section (Defs.' Br. Supp. Mot. Dismiss Pl.'s

Compl. 13–20, ECF No. 14) demonstrates why the Consortium is entitled to the relief it

seeks in the case. The government's refusal to issue an advisory opinion is entirely arbi-

trary and capricious. It says it has not or cannot do what the Consortium asks, ultimately,

because the United States District Court for the District of Columbia vacated the previous

presidential administration's 2018 rule and it is preparing to engage in new notice-and-

comment rulemaking. (*Id.* at 7–9.) As the government explains, however, the challenged

portion of the 2018 rule dealt with the "Pathway 2" multiple employer welfare arrangement ("MEWA"). But the Consortium's advisory opinion request addresses the "Pathway 1" MEWA, which has been historically and traditionally recognized by the government as an ERISA-covered single-plan MEWA.

The government's decision to hide behind a single district court decision on an unrelated issue has significant consequences for the Consortium: If it is ultimately adjudged not to be a single-plan MEWA, the Consortium's members face the prospect of fines and other consequences. This is no speculative or unfounded concern. The Employment Benefit Security Administration ("ESBA")—the assistant secretary of which is the Secretary's designee to administer Title I of ERISA (Defs.' Br. 14, ECF No. 14) —has made the policing of MEWAs a "National Enforcement Project." Specifically:

> In addition, EBSA is continuing its long-standing efforts to seek out and shut down abusive Multiple Employer Welfare Arrangements (MEWAs) and to proactively identify known fraudulent MEWA operators to ensure they do not terminate one MEWA just to open another in a different state. To assist in these efforts, ACA authorizes the Secretary of Labor to immediately issue a cease and desist order when fraud is apparent. The Secretary may also seize assets from a MEWA when probable cause exists to believe that the plan is in a financially hazardous condition. The final regulations, effective on April 1, 2013, established policies and procedures for the implementation of the cease and desist and summary seizure rules. EBSA also conducts criminal investigations of MEWAs. Criminal MEWAs investigated by EBSA have engaged in a range of crimes, from mail fraud, wire fraud, bankruptcy fraud, to theft. MEWA criminal cases are typically prosecuted by U.S. Attorneys' offices. They have resulted in jail sentences and court ordered restitution against fraudulent MEWA operators.

*Enforcement*, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/enforcement (under "National Enforcement Projects" subheading) (last visited August 3, 2023).

## BACKGROUND

Independent Colleges of Indiana, Inc. ("ICI") is a group of 29 nonprofit regionally-accredited colleges and universities in Indiana. (Compl. ¶ 14, ECF No. 1.) More than three years ago, ICI and five of its member institutions formed the Consortium to implement

the ICI Benefits Consortium Health Benefit Plan (the "Plan") and a multiple employer welfare arrangement (the "Arrangement"). (*Id.* at ¶ 16.) Multiple Employer Welfare Arrangements (MEWAs) are mechanisms through which multiple employers (such as universities) unite to provide aggregated health and other welfare benefits to their employees, reducing costs for employers through economies of scale, shared administrative costs, and risk spreading.

The Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act") governs certain MEWAs, including those that constitute an "employee welfare benefit plan." 29 U.S.C. § 1002(1). Due to the various obligations ERISA imposes, the Consortium needs to know the status of the Arrangement and the Plan under ERISA. Is the Arrangement indeed a "multiple employer welfare arrangement" under ERISA? Is the Plan a single "employee welfare benefit plan" under ERISA as the Consortium intended when it structured the Plan, or is it actually multiple plans each sponsored separately by a participating employer? The answers to those questions are the difference between compliance and the exposure to substantial fines and penalties.

The United States Department of Labor provides answers. "It is the practice of the Department of Labor to answer inquiries of individuals or organizations affected, directly or indirectly, by [ERISA] as to their status under the Act…." ERISA Procedure 76-1, 41 Fed. Reg. 36281 (Aug. 27, 1976). Accordingly, in April 2020, the Trustees of the Consortium, by counsel, submitted a request to the United States Department of Labor (the "Department" or "DOL") for an advisory opinion on the status of the Consortium, chiefly

seeking confirmation that the Plan is indeed a single plan MEWA (the "Advisory Opinion

Request"). (Compl. ¶ 1, Ex. A, ECF No. 1-1.)

Contrary to the Department's "practice," the Department has refused to answers

the Consortium's questions. In purported support of its refusal to respond, the Depart-

ment hides behind ongoing litigation: the district court decision in *New York v. United*

*States Department of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019) and its subsequent appeal,

which is presently stayed. That case is, at best, tangentially related to the Consortium's

Advisory Opinion Request. Stated plainly, that case involves something completely dif-

ferent.

The district court in the *New York* case vacated significant portions of then-new

regulations from the DOL (83 Fed. Reg. 28912, the "2018 Final Rule") that created an en-

tirely separate framework for association health plans to qualify as an ERISA-covered

MEWA with more expansive definitions. *See New York*, 363 F.Supp.3d at 120 (describing

expansion of existing standards for formation of association health plans (essentially,

MEWAs)). That framework has nothing to do with this case or the Advisory Opinion

Request. (The separate framework under the more recent final rule is often referred to in

industry parlance as "Pathway 2," as opposed to "Pathway 1," which refers to the prior

rules without the expansive definitions.) The Consortium's Advisory Opinion Request

sought a determination that it qualifies as a Pathway 1 MEWA, which has long been the

standard and which was not at issue in the *New York* case.

The Department acknowledges the irrelevance of the *New York* decision. Formal

guidance published by the DOL in 2019 stated that the *New York* decision does not affect

Pathway 1 MEWAs. (Compl. ¶ 41, ECF No. 1.) And the Department's correspondence refusing to address the Consortium's Advisory Opinion Request admits that "the district court decision and appeal do not technically involve the Department's pre-rule advisory opinions/sub-regulatory guidance [regarding] ERISA (Pathway 1)…." (Defs.' Mot. Dismiss Pl.'s Compl., Ex. B, ECF No. 13-2.)

Even so, the Department frames it as being "unable to formally address the two advisory opinion requests" because "it is *possible* that the appeal or actions of the current Administration … *may implicate* aspects of the Department's pre-rule advisory opinions/sub-regulatory guidance" (emphasis added). (Defs.' Mot. Dismiss, Ex. B, ECF No. 13-2.) Yet, the Department has instructed the Consortium that it (and others in "the regulated community") "can use the pre-rule advisory opinions/sub-regulatory guidance to evaluate their arrangement's status as an [association health plan] under Pathway 1." (*Id.*) Incongruently, the Department maintains that the regulated community can rely on the Pathway 1 guidance at the same time it refuses to apply that same Pathway 1 guidance to a particular set of facts, which ratchets up the Consortium's risk.

The Department's steadfast refusal leaves the Consortium trapped in limbo, mired in the uncertainty of the status of the Plan and the Arrangement despite diligent efforts to ensure compliance with ERISA and its accompanying obligations. Meanwhile, amidst this real regulatory uncertainty, the DOL is targeting MEWAs through its "National Enforcement Project." *See* https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/enforcement. To be clear, the Consortium is not fraudulent, abusive, or in a financial hazardous condition. To the contrary, the Trustees of the Consortium wish to comply in

good faith with the law and are requesting simple confirmation from the DOL, which it is denying for arbitrary and capricious reasons.

The Consortium needs answers in the form of the application of legal rules established by the Department to a particular set of facts. With the Department abdicating its role, the Consortium has been forced to turn elsewhere to escape its regulatory purgatory. To that end, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Moreover, "[i]t is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress." *Id.* at 147. The Consortium respectfully requests that the Court provide the relief it seeks, redress the ongoing the case and controversy against the Department, and determine whether or not the Consortium has implemented a single-plan MEWA.

## LEGAL STANDARD

"Motions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). Although not specified, Defendants' Motion to Dismiss reads as a facial attack on subject matter jurisdiction. (Defs.' Mot. Dismiss 11, ECF No. 14.) "A facial attack [under Rule 12(b)(1) tests whether the allegations, taken as true, support an inference that the elements of standing exist," and such "attack does not challenge the alleged facts themselves." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). Within a facial attack, courts "accept well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Prairie Rivers Network*

*v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). Moreover, "the court may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." *Bazile*, 983 F.3d at 279. "For facial standing challenges, … [courts] employ the familiar 'plausibility' requirement—the same standard used to evaluate challenges to claims under Rule 12(b)(6)." *Prairie Rivers Network*, 2 F.4th at 1008.

Likewise, "[t]he purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not the merits of the lawsuit." *Mabes v. McFeeley*, No. 1:21-cv-02062-JRS-DLP, 2022 WL 20357997, at *1 (S.D. Ind. Apr. 19, 2022). The legal sufficiency of a complaint is "measured against the standards of Rule 8(a)", requiring a short and plain statement showing that the pleader is entitled to relief. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020); Fed. R. Civ. P. 8(a). "At the motion to dismiss stage, [courts] accept all well-pled facts alleged in the complaint as true and draw all reasonable inferences in plaintiffs' favor." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 881 (7th Cir. 2022).

"The bar to survive a motion to dismiss is not high." *Gociman*, 41 F.4th at 881. "It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) (cleaned up) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge [that] 'recovery is very remote and unlikely.'" *Gociman*, 41 F.4th at 881 (quoting *Twombly*, 550 U.S. at 556). "Dismissal is proper only if it is clear that no relief

could be granted under any set of facts that could be proved consistent with the allegations." *Id.* at 881–82 (cleaned up).

**ARGUMENT**

**I.    The Consortium faces a substantial risk of harm sufficient to confer standing.**

The government's contention that the Consortium lacks standing (Defs.' Br. 24–28, ECF No. 14) is wrong. "To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). "'[I]mminence' is concededly a somewhat elastic concept…." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992). Indeed, the Supreme Court's "cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Rather, the case law has recognized various formulations of the injury-in-fact requirement, *see, e.g., Clinton v. City of New York*, 542 U.S. 417, 432 (1998) ("sufficient likelihood of economic injury … to establish standing"), *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154 (2010) ("reasonable probability"), consistent with the requirement's purpose which "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Despite the government's challenge, "[a]n allegation of future injury may suffice if . . . there is a '"substantial risk" that the harm will occur.'" *Susan B.*, 573 U.S. at 158

(quoting *Clapper*, 568 U.S. at 414 n.5). More applicably to this context, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). In any event, probabilistic injuries, especially a government threat of enforcement, may confer standing.

The government's enforcement agents do not need to be knocking down the Consortium's metaphorical door for the Consortium to have standing to bring this action. The core issue is that the government refuses to advise the Consortium on the status of the Arrangement and the Plan while its enforcement priorities highlight MEWAs. Moreover, the reality is that if the Consortium is mistaken and it has implemented a non-plan MEWA, economic injury ensues. For example, if the Plan is a non-plan MEWA, then each of the member institutions (as participating employers) has to prepare and submit its own separate Form 5500 filing. The maximum penalty for failure to file reaches $2,586 daily. *See* 88 Fed. Reg. 2219 (Jan. 13, 2023) (fines for failure of ERISA plan to file annual report). The assessment of these daily fines against Consortium members, and the resultant impact on the Consortium, is the sort of harm recognized by the APA.

Furthermore, the uncertainty surrounding the Plan's status caused by the Department discourages other ICI members from joining the Consortium. This is not speculative. ICI is a defined group of Indiana higher education institutions. (Compl. ¶ 14, ECF No. 1.) To date, only five of ICI's 29 member institutions have joined the Consortium despite its strong early financial success. (*Id.* at ¶ 16–17.) A reasonable inference therefrom is that a greater percentage of members would join the Consortium to achieve the

financial benefits of a Pathway 1 MEWA, but the Plan's unconfirmed status (caused by the DOL refusal to act on the Advisory Opinion Request) creates an unnecessary risk, deterring increased membership in the Consortium. The Consortium has standing to maintain this action.

## II.     The Department's steadfast refusal amounts to a final agency action.

The government's refusal to act amounts to final agency action because the Consortium faces the risk of substantial fines, becoming a target of EBSA's national enforcement project, and inability to add new members, all because the government is relying on an inapplicable determination of the *New York* case with respect to the traditional Pathway 1 MEWA. The Administrative Procedure Act ("APA") provides that "final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "[A]gency action" includes a "failure to act." 5 U.S.C. § 551(13). And two conditions must be satisfied for agency action to be "final" under the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Assessing finality is interpreted with a "pragmatic" approach, *id.* at 599 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99, (1977)) or "a flexible view." *Gardner*, 387 U.S. at 150.

The consummation of the Agency's decisionmaking process exists when the action is "not subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). In its own words, the Department is "unable to formally address the two advisory opinion requests," leaving the Consortium's Advisory Opinion Request suspended in limbo for an indefinite period of time, as the Consortium has no other recourse within the DOL to seek the type of formal guidance on which it can rely. The Department has stalled addressing the Advisory Opinion Request such that it has effectively signaled the end of the process for the Advisory Opinion Request. Viewed in a pragmatic and flexible way, there is finality to this action.

The Department characterizes the refusal to address the Advisory Opinion Request as tentative, and not a conclusive evaluation of the Consortium's Advisory Opinion Request. This is merely a repackaged version of an unavailing argument. In *Data Marketing Partnership, LP v. United States Department of Labor*, 45 F.4th 846 (5th Cir. 2022), which examined the only advisory opinion that the DOL has issued within the last four years, "the Department recycle[d] an argument that the Supreme Court has repeatedly rejected: The action isn't final because the agency can change its position or its reasons for the decision after more factfinding." 45 F.4th at 854. But "[t]his argument is squarely foreclosed by numerous Supreme Court decisions." *Id.* (citing *Sackett*, 566 U.S. at 127 ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."); *Hawkes*, 578 U.S. at 598 ("The Corps may revise an [action] within the

five-year period based on new information. That possibility, however, is a common char-

acteristic of agency action, and does not make an otherwise definitive decision nonfinal."

(quotation omitted))). As the Fifth Circuit reasoned, "[a]n action is either final or not, and

the mere fact that the agency could—or actually does—reverse course in the future does

not change that fact." 45 F.4th at 854.

Furthermore, that the Department has signaled some intention to conduct further

rulemaking has no bearing on this issue. Its reliance on *Virginia Beach Policemen's Benevo-*

*lent Association v. Reich*, 881 F. Supp. 1059 (E.D. Va. 1995) on this point is misplaced. (*See*

Defs.' Br. 20, ECF No. 14.) There, the court's analysis in determining whether the final

agency action requirement had been satisfied was "without considering the impact of the

Secretary's statement of intent appearing in the *Federal Register*." 881 F. Supp. at 1065 n.8.

Rather, "the Secretary's mere intention to develop a regulation does not undermine the

fact that the Secretary has consistently refused to make individual rulings." *Id*. at 1065.

That is, an intent to develop a rule in the future is not a basis to say that the refusal to act

in the past cannot serve as a final agency action.

The government further argues that even if it were to publish an advisory opinion,

it would not "be a consummation of the agency's decisionmaking process," because it is

"tentative" and "does not conclusively determine any facts after an investigation, but in-

stead relies exclusively on a party's limited representation in its request." (Defs.' Br. 32,

ECF No. 14.) But this ignores the effect of the advisory opinion issued on those facts—the

parties described in the request "may rely on the opinion only to the extent that the re-

quest fully and accurately contains all the material facts and representations necessary to

issuance of the opinion and the situation conforms to the situation described in the request for the opinion." ERISA Procedure 76-1 § 10. In fact, the government's argument was squarely addressed and rejected by the Fifth Circuit in the *Data Marketing* case. There, the court in discussing the Department's advisory opinion said, "An action is either final or not, and the mere fact that the agency could—or actually does—reverse course in the future does not change that fact." *Data Mktg.*, 45 F.4th at 854. The court further recognized that the Department's own procedure document for advisory opinions "contemplates that the 'failure to obtain an advisory opinion' can cause 'unusual hardship.'" *Id.* at 855 (quoting 41 Fed. Reg. at 36,282).

Here, the government's refusal to act is the consummation of the agency's decisionmaking process, because it exposes the Consortium to the risk of fines on a specific topic the EBSA has highlighted in its national enforcement project. *See id.* at 854 ("The advisory opinion also determined rights, produced obligations, or caused legal consequences."). This is true even though the government's decision to leave the Consortium in legal limbo is based on a vacated regulation's treatment of the irrelevant Pathway 2 to MEWA status. Thus, the government's refusal to act in this context is a final decision in a pragmatic and flexible sense. *See Hawkes*, 578 U.S. at 599; *Gardner*, 387 U.S. at 150.

The government's argument that its refusal to act does not impose "legal consequences" (Defs.' Br. 33–36, ECF No. 14) is simply its standing argument dressed up in merits language. Although an advisory opinion is not necessary "to qualify as a single-plan MEWA" (*id.* at 34), the Advisory Opinion Request seeks safe harbor from ERISA's fines and the EBSA's enforcement priority on MEWAs. Again, the government's reliance

on cases like *Virginia Beach* (*id.* at 35) is misplaced. This case does not present a situation where the government is proposing a new regulation in an area previously untouched by the administrative state. Instead, it involves the government's arbitrary and capricious position that one federal district court's decision addressing the Pathway 2 MEWA regulation prevents it from recognizing what it has always recognized, namely, the Pathway 1 MEWA. This comes at specific cost to the Consortium, as addressed in the standing discussion, namely, its inability to secure new members.

### III.   The DOL's discretionary decision is nevertheless reviewable.

The government's contention that the Court has no power to address the EBSA's arbitrary and capricious abuse of discretion because the EBSA had the discretion to act arbitrarily and capriciously is circular. "The Supreme Court has explained that § 701's limitation on judicial review is 'a very narrow exception' applicable only when there is 'no law to apply.'" *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072 (7th Cir. 2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). Courts examine statutes and regulations in search of "judicially manageable standards ... for judging how and when an agency should exercise its discretion." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  In that vein, "it has been well established that a discretionary decision may be reviewable to the extent that it rests on an explicit mistake of law or other egregious error." *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001).

A judicially manageable standard exists in ERISA Procedure 76-1, "describing the general procedures of the department in issuing information letters and advisory opin-

ions under the Act, and is designed to promote efficient handling of inquiries and to fa-cilitate prompt responses." 41 Fed. Reg. 36281 (Aug. 27, 1976). "It is the practice of the Department of Labor to answer inquiries of individuals or organizations affected, directly or indirectly, by [ERISA] as to their status under the Act…." *Id.* ERISA Procedure 76-1 further provides that "[i]f an inquiry presents an issue on which the answer seems to be clear from the application of the provisions of the Act to the facts described, the advisory opinion will be issued in accordance with the procedures contained herein."

The Consortium's Advisory Opinion Request is not overly complicated. The Con-sortium was established consistent with guidance established in Advisory Opinion 2017-02AC. And as the Department admits, the legal framework for Pathway 1 has remained undisturbed. *Compare* Defs.' Br. 7, ECF No. 14 ("[T]he final [2018] rule retained the De-partment's prior guidance as one pathway to coming a single-plan MEWA—what is sometimes referred to as 'Pathway 1,'….") *with New York*, 363 F.Supp.3d at 141 ("DOL unreasonably expands the definition of 'employers' to include groups without any real commonality of interest . . . despite Congress's clear intent that ERISA cover benefits aris-ing out of employment relationships."). And while advisory opinions are factually spe-cific determinations, the Arrangement and the Plan do not present unusually novel cir-cumstances. Rather, the Arrangement and the Plan were structured in line with guidance from previous advisory opinions from the Department, presenting factual analogies. *See, e.g.*, U.S. Dep't of Lab. Advisory Opinions 2017-02AC; 2005-24A; 2005-25A.

In response, however, the DOL has departed from its procedure of "the efficient handling of inquiries," especially where the answer "seems to be clear." And its stated

reason for departure — the possibility of potential implications from the *New York* case — is an explicit mistake of law or egregious error (*Mills*, 244 F.3d at 5) in that it conflicts with prior guidance in which the Department recognized that the *New York* decision is unrelated to Pathway 1 MEWAs. (*See* Compl. ¶ 41, ECF. No. 1 (referring to DOL "Questions and Answers – Part Two" publication on May 13, 2019).) The Department's discretionary decision to refuse to address the Advisory Opinion Request does not preclude judicial review; rather, it evinces an abuse of discretion.

**IV.** **The Consortium's requests for declaratory and injunctive relief state viable claims for relief.**

The government's contention that the Consortium is not entitled to declaratory or injunctive relief (Defs.' Br. 42–45, ECF No. 14) erroneously assumes that the Consortium's substantive APA claim fails. ERISA authorizes parties "to restrain the Secretary from taking any action contrary to the provisions of this Act." 29 U.S.C. § 1132(k). It further empowers a party to "obtain appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of a plan." 29 U.S.C. § 1132(a)(3)(B)(ii). Those provisions, and the Declaratory Judgment Act, served as the basis for the United States District Court for the Northern District of Texas to adjudicate a claim arising out of an advisory opinion issued by the Department on an ERISA issue, and to permanently enjoin the Department from acting in a contrary manner to the court's legal determination. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 490 F. Supp. 3d 1048, 1055–56 (N.D. Tex. 2020), *aff'd in part, vacated in part, remanded,* 45 F.4th 846 (5th Cir. 2022).

Both the district court and the Fifth Circuit in the *Data Marketing* case determined that the Department misinterpreted ERISA with respect to the issue in the case (namely, whether and under what circumstances working owners could participate in the single employer welfare plans involved in the case). Although the Fifth Circuit vacated the district court's injunction, it did so not because the district court erroneously enjoined the Department from acting in a manner contrary to the court's legal determination. Instead, it vacated the injunction because the appellate court wanted the district court to consider the legal question under the standards established by the appellate court. 490 F. Supp. 3d at 1064; 45 F.4th at 858. The Fifth Circuit did not question the district court's authority to determine the law of ERISA, apply it to the facts of the case in front of it, or enjoin the Department from acting in a contrary manner. 45 F.4th at 858–860.

The Consortium's request for declaratory and injunctive relief is dependent on whether it has stated a viable claim under the APA. It has. Consequently, the right time to address the relief, if any, available to the Consortium is when the Court addresses the merits of the claim.

<u>C</u>ONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

Respectfully submitted,

*/s/ Andrew M. McNeil*
Andrew M. McNeil (# 19140-49)
W. James Hamilton (# 20155-49)
Dakota C. Slaughter (# 37582-29)

BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000
AMcNeil@boselaw.com
JHamilton@boselaw.com
DSlaughter@boselaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, a copy of the foregoing document was filed electronically.  Notice of this filing will be served on the following parties by operation of the Court's electronic filing system.

Yoseph T. Desta
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L. Street NW
Washington, DC 20005
Yoseph.T.Desta@usdoj.gov

*/s/ Andrew M. McNeil*
Andrew M. McNeil (#19140-49)

4618201

18