**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ICI BENEFITS CONSORTIUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00603 |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR, | ) | |
| JULIE SU, *in her official capacity* | ) | |
| *as Acting Secretary of Labor*, and | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ....................................................................................................... 1

I.   Plaintiff's Alleged Risks Of Harm Do Not Confer Standing ............................... 1

II.  Plaintiff Does Not State A Claim Based On The Department's Failure To Issue An
     Advisory Opinion............................................................................................... 7

     A.  The Department's Failure to Issue an Opinion Is Not a Final Agency Action............ 7

     B.  Plaintiff Cannot Plead a Final Agency Action as an End Run Around Its Inability to
         Plead Impermissible Agency Inaction ........................................................ 14

     C.  The Department's Decision Is Committed to Agency Discretion by Law ................. 14

III. Plaintiff Is Not Entitled To Declaratory Or Injunctive Relief ........................................... 19

CONCLUSION............................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

CASES

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................ 11, 14

*Aldrich v. Nat'l Collegiate Athletic Ass'n*,
  565 F. Supp. 3d 1094 (S.D. Ind. 2021) ............................................................................ 3

*Bd. of Trade of City of Chicago v. SEC*,
  883 F.2d 525 (7th Cir. 1989) ........................................................................................ 12

*Cardoza v. Commodity Futures Trading Comm'n*,
  768 F.2d 1542 (7th Cir. 1985) ...................................................................................... 19

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................... 2, 3, 4, 6

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) .......................................................................... 8, 11, 12, 20

*Dhakal v. Sessions*,
  895 F.3d 532  (7th Cir. 2018) ........................................................................................ 11

*Dinerstein v. Google, LLC*,
  73 F.4th 502  (7th Cir. 2023) .......................................................................................... 2

*Doe v. McAleenan*,
  926 F.3d 910 (7th Cir. 2019) ........................................................................................ 16

*Driftless Area Land Conservancy v. Rural Utils. Serv.*,
  74 F.4th 489 (7th Cir. 2023) ......................................................................................... 13

*Forusall, Inc. v. U.S. Dep't of Lab.*,
  No. 22-cv-1551, 2023 WL 5559682 (D.D.C. Aug. 29, 2023) ........................................ 8

*FTC v. Standard Oil Co.*,
  449 U.S. 232 (1980) ...................................................................................................... 11

*Haaland v. Brackeen*,
  143 S. Ct. 1609 (2023) .................................................................................................... 6

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................................... 18

*Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*,
    587 F. Supp. 2d 13 (D.D.C. 2008) .......................................................... 15

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*,
    335 F.3d 607 (7th Cir. 2003) ................................................................... 9

*Knutson v. Vill. of Lakemoor*,
    932 F.3d 572 (7th Cir. 2019) ................................................................. 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 2

*Lunney v. United States*,
    319 F.3d 550 (2d Cir. 2003) .................................................................. 16

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .................................................................. 6

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ............................................................ 19

*McMaster v. United States*,
    731 F.3d 881 (9th Cir. 2013) ................................................................. 19

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ........................................................................... 4, 5

*Menominee Indian Tribe of Wis. v. EPA*,
    947 F.3d 1065 (7th Cir. 2020) ............................................................... 15

*Mills v. Apfel*,
    244 F.3d 1 (1st Cir. 2001) ..................................................................... 15

*Nat'l Ass'n of Home Builders v. Norton*,
    298 F. Supp. 2d 68 (D.D.C. 2003) .......................................................... 7

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) .............................................................................. 19

*Pendleton Heights Gay-Straight All. v. S. Madison Cmty. Sch. Corp.*,
    577 F. Supp. 3d 927 (S.D. Ind. 2021) ..................................................... 6

*Perrigo Rsch. & Dev. Co. v. U.S. Food & Drug Admin.*,
    290 F. Supp. 3d 51 (D.D.C. 2017) ......................................................... 12

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) .................................................................. 11

*Sackett v. EPA,*
  566 U.S. 120 (2012) ............................................................. 11, 13, 14

*Sierra Club v. EPA,*
  955 F.3d 56 (D.C. Cir. 2020) .............................................................. 9, 10

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ................................................................................... 7

*Steenholdt v. FAA,*
  314 F.3d 633 (D.C. Cir. 2003) .............................................................. 15

*Steffel v. Thompson,*
  415 U.S. 452 (1974) .................................................................................... 5

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................................................... 2

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ........................................................................... 1, 4, 5

*Sweeney v. Raoul,*
  990 F.3d 555 (7th Cir. 2021) ................................................................... 4

*Tenn. Gas Pipeline Co. v. FERC,*
  736 F.2d 747 (D.C. Cir. 1984) ................................................................. 4

*Terrace v. Thompson,*
  263 U.S. 197 (1923) .................................................................................... 5

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) ................................................................... 8

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ........................................................................... 11, 13

*Util. Air Regul. Grp. v. EPA,*
  320 F.3d 272 (D.C. Cir. 2003) .............................................................. 11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) .................................................................................... 6

*Va. Beach Policemen's Benevolent Ass'n v. Reich,*
881 F. Supp. 1059 (E.D. Va. 1995) ............................................................ 9, 11, 12

*Wis. Right to Life, Inc. v. Paradise,*
138 F.3d 1183 (7th Cir. 1998) ............................................................................ 6

*Wis. Right to Life, Inc. v. Schober,*
366 F.3d 485 (7th Cir. 2004) .............................................................................. 4

STATUTES

5 U.S.C. § 701(a)(2) ....................................................................... 15, 16, 18, 19

5 U.S.C. § 706(1) ........................................................................................ 7, 15

5 U.S.C. § 706(2) ............................................................................................ 14

29 U.S.C. § 1132(k) ........................................................................................ 20

REGULATIONS

ERISA Procedure 76-1,
41 Fed. Reg. 36,281 (Aug. 27, 1976) ................................................... *passim*

OTHER SOURCES

EBSA, *Enforcement: National Enforcement Projects,*
https://perma.cc/M8FH-SV2L ........................................................................ 3

Office of Information and Regulatory Affairs, Office of Management and Budget, Reginfo.gov,
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=1210-AC16
(Spring 2023 Regulatory Agenda) ............................................................... 10

## INTRODUCTION

Plaintiff states in its Opposition to the Department's Motion to Dismiss that the absence of an advisory opinion has imposed "significant consequences" on it, but it never backs up this claim. Dkt. 19 at 2. Plaintiff's Opposition, like its Complaint, fails to plausibly substantiate any legal or economic consequences that would confer Article III standing or give rise to a final agency action under the Administrative Procedure Act ("APA"). Nor does Plaintiff's Opposition address the language in ERISA Procedure 76-1 that explicitly commits the decision whether to issue or withhold an advisory opinion to the total discretion of the Department. And Plaintiff's Opposition fails to address the impropriety of the declaratory and injunctive relief that it seeks. For these reasons, the Court should grant the Department's Motion to Dismiss.

## I.      Plaintiff's Alleged Risks Of Harm Do Not Confer Standing

Plaintiff's Opposition confirms that Plaintiff lacks standing to sue over the Department's failure to issue it an advisory opinion. Plaintiff largely reiterates the speculative and attenuated allegations in its Complaint of legal and economic harm, with no serious effort to address the Department's various arguments for why these alleged harms do not, as Article III requires, present imminent and redressable injuries in fact. Dkt. 14 at 24–28.

*Alleged Legal Harm*: Throughout its Opposition, Plaintiff repeatedly emphasizes that the lack of an advisory opinion subjects it to legal "uncertainty" as to its MEWA status under ERISA. Dkt. 19 at 5 (also describing its "risk" and its status as "in limbo"), 9–10 (similar), 13 (similar). Yet legal uncertainty and potential legal risks do not represent concrete and imminent injuries in fact under Article III. Dkt. 14 at 24–25. Article III requires that any alleged future harms are not mere possibilities; instead, as explained by the case law that Plaintiff itself relies on, the harms must be "certainly impending" or pose a "substantial risk" of occurring. *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted, quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (cited at Dkt. 19 at 8). Plaintiff identifies no legal harm that is certainly impending or at substantial risk of occurring.[1]

In reiterating that its members face "daily fines" if the Department ultimately deems it to be a non-plan MEWA, Dkt. 19 at 9, Plaintiff conveniently ignores the multi-step causal chain that would have to occur for fines to be levied. That causal chain includes not only that the Department would investigate Plaintiff, but also that the Department would in fact determine that Plaintiff is a non-plan MEWA, find fineable violations, and issue penalties despite Plaintiff's belief that it was a single-plan MEWA and despite its pending advisory opinion request to that effect. Dkt. 14 at 25. Plaintiff further ignores that the Department's email responses—which clearly indicate that the Department does not intend to even consider Plaintiff's MEWA status while the regulatory landscape on MEWA coverage is in flux, and that Plaintiff is free in the interim to determine its status and operate under the Department's pre-2018 subregulatory guidance—dispel any actual threat of legal harm. *Id.* at 26. And Plaintiff's own discussion of its MEWA and plan and the existing regulatory regime is inconsistent with, and thereby further undermines, its theory of legal harm. Plaintiff states that it "structured" its MEWA and plan "in line with guidance from previous advisory opinions from the Department," and that the pending *New York* litigation does not affect this prior guidance. Dkt. 19 at 15; *see* Dkt. 1 at 8–9 (¶ 41). In other words, Plaintiff contends that

---

[1] Plaintiff cannot avoid Article III's injury-in-fact requirement by watering it down to make any "probabilistic injur[y]" suffice. Dkt. 19 at 9. Although, as Plaintiff quotes, the Supreme Court has stated that "[i]mminence is concededly a somewhat elastic concept," *id.* at 8 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992)), Plaintiff omits the Court's warning in the same sentence that imminence "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending," *Lujan*, 504 U.S. at 564 n.2 (emphasis added); *see, e.g., Dinerstein v. Google, LLC*, 73 F.4th 502, 511–12, 515 (7th Cir. 2023) (similar); *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 497, 499 (2009) (rejecting standing based on "a statistical probability that some [organization] members are threatened with a  concrete injury," because that probabilistic standard flouts the requirement of "a factual showing of perceptible harm" (quotation marks omitted)). Plaintiff identifies no certainly impending injury.

it operates within the bounds of established guidance and existing law, which discredits its speculation regarding enforcement risks.

At most, Plaintiff faces a hypothetical, subjective, and generalized fear of increased risk from government conduct, which precedent squarely establishes is insufficient. *See, e.g.*, *Clapper*, 568 U.S. at 416 (describing how a "hypothetical future harm" is insufficient to confer Article III standing, and how it is insufficient to allege a "subjective fear" of injurious governmental action, even if that fear "is not fanciful, irrational, or clearly unreasonable" (quotation marks omitted)); *cf. Aldrich v. Nat'l Collegiate Athletic Ass'n*, 565 F. Supp. 3d 1094, 1102 (S.D. Ind. 2021) (similar).

Plaintiff cannot transform its non-cognizable legal uncertainty into a cognizable, imminent Article III injury simply by pointing to an EBSA webpage that identifies shutting down abusive MEWAs as an agency enforcement project. *See, e.g.*, Dkt. 19 at 2 (relying on EBSA, *Enforcement: National Enforcement Projects*, https://perma.cc/M8FH-SV2L), 9 (same), 13 (discussing "the risk of fines on a specific topic … EBSA has highlighted"). Plaintiff ignores the actual language of the webpage, which makes clear that the enforcement project has no bearing on this case.

EBSA states on the webpage that its project seeks "to ensure that" "abusive" and "known fraudulent MEWA operators … do not terminate one MEWA just to open another in a different state," to shut down MEWAs and "seize" their "assets … when probable cause exists to believe that the plan is in a financially hazardous condition," and to investigate MEWA criminal conduct such as wire fraud, bankruptcy fraud, and theft. EBSA, *Enforcement: National Enforcement Projects*. Plaintiff fails to explain how EBSA's focus on *known fraudulent and financially perilous MEWAs* and on *criminal MEWA conduct* has any bearing on its advisory opinion request, which simply concerns whether Plaintiff qualifies as a single-plan or non-plan MEWA under ERISA. Plaintiff does not set forth any "specific facts demonstrating that" EBSA intends to "target[]" it or

any other similarly situated employer group under this enforcement project or any other project. *Clapper*, 568 U.S. at 412.  In fact, Plaintiff makes clear that it does not believe itself to be a target of the abusive MEWA enforcement project or any other one, explaining that it "is not fraudulent, abusive, or in a financially hazardous condition," and instead just seeks "*simple confirmation* from the [Department]" about its MEWA status.  Dkt. 19 at 5–6 (emphasis added).  That proves dispositive here.  "[F]ederal courts do not deal in advice" and are not in the business of simply providing parties "additional legal certainty."  *Sweeney v. Raoul*, 990 F.3d 555, 561 (7th Cir. 2021); *see Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) (similar).  As a result, courts routinely dismiss cases where, as here, the plaintiff fails to tie "theoretical harm to an actual and imminent threat of enforcement," *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490 (7th Cir. 2004), or allege that the government "has taken even a single step along the path to enforcement," *Sweeney*, 990 F.3d at 560.

Although "[t]he government's enforcement agents do not need to be knocking down [Plaintiff's] metaphorical door for [Plaintiff] to have standing," Dkt. 19 at 9, Plaintiff nonetheless lacks standing based on a government threat of enforcement, because it does not plausibly allege a "*credible and imminent*" enforcement threat.  *Sweeney*, 990 F.3d at 560 (emphasis added).  For this reason, Plaintiff errs in relying on case law such as *Driehaus*, 573 U.S. 149, and *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).  The Consortium fails to acknowledge that both cases addressed circumstances where the plaintiffs alleged "credible" and "imminent" threats of enforcement, including by pointing to "a history of past enforcement … against the same conduct." *Driehaus*, 573 U.S. at 159, 164.  In *Driehaus*, for example, the plaintiff had already been the subject of a complaint under the statute it challenged, a state law criminalizing certain false statements made during political campaigns.  *Id.* at 164 (also emphasizing that state agency had

already found probable cause that plaintiff had violated state law, which could be used by future complainants against plaintiff); *see id.* at 159–61 (summarizing case law with credible enforcement threats, including *Steffel v. Thompson*, 415 U.S. 452 (1974), where plaintiff challenging constitutionality of trespass statute "had been warned to stop handbilling and threatened with prosecution if he disobeyed," and his handbilling companion was actually arrested and charged with trespass); *MedImmune*, 549 U.S. at 129 (discussing *Steffel* and *Terrace v. Thompson*, 263 U.S. 197 (1923), where "the State threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an alien in violation of the State's anti-alien land law").[2] By contrast, Plaintiff has not alleged that the Department has investigated, warned, or punished it or other similarly situated groups for any ERISA violations based on their MEWA status.

***Alleged Economic Harm***:  Plaintiff reiterates in cursory fashion the allegation in its Complaint that the absence of an advisory opinion causes it economic harm because "the uncertainty surrounding [its MEWA] status … discourages other ICI members from joining the Consortium."  Dkt. 19 at 9.  This argument fails because, as the Department has already observed, (1) it is entirely speculative, since Plaintiff identifies no discouraged colleges or universities; and (2) Plaintiff does not plausibly tie its lack of an advisory opinion to the unfettered decisionmaking of independent institutions to join or abstain from joining its health insurance consortium.  Plaintiff barely acknowledges these fatal deficiencies.  Plaintiff simply declares (with no substantiation) that its economic harm is "not speculative," and it then immediately proceeds to engage in speculation and supposition by asserting (again with no proof) that it is "reasonable" to infer that

---

[2] *Driehaus* is further distinguishable because the plaintiffs there plausibly alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  573 U.S. at 159 (quotation marks omitted); *see id.* at 160–64.  Here, Plaintiff has not challenged an ERISA statutory provision (or any other statutory provision), expressed an intent to engage in any proscribed behavior under that challenged statute, or raised any constitutional interest.

additional member institutions would join its consortium if the Department acted on its opinion request. Dkt. 19 at 9. Plaintiff cannot use bare guesswork and inferences to meet its burden of adducing specific facts showing actual or imminent monetary harm—much less such harm flowing from the autonomous decisions of third parties not before the Court. Dkt. 14 at 27; *see also, e.g.*, *Clapper*, 568 U.S. at 410 (merely identifying an "objectively reasonable likelihood" of injury is "inconsistent with our requirement that threatened injury must be certainly impending to constitute injury in fact" (quotation marks omitted)).

**Redressability**:  Plaintiff completely ignores the Department's argument that none of the injuries alleged in the Complaint are redressable. The Court has no power to direct the issuance of an advisory opinion that Plaintiff is a single-plan MEWA—which is what Plaintiff ultimately seeks, and the only thing that would address its alleged injuries. Dkt. 14 at 27; *see Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023) (explaining that "[r]edressability requires that the court be able to afford relief through the exercise of its power" (quotation marks omitted and emphasis omitted)). As a result, Plaintiff waives any argument it could raise in response, *see, e.g.*, *Pendleton Heights Gay-Straight All. v. S. Madison Cmty. Sch. Corp.*, 577 F. Supp. 3d 927, 933 (S.D. Ind. 2021), and it fails to meet its burden to demonstrate redressability. That alone requires dismissal. *See, e.g.*, *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1185–88 (7th Cir. 1998).

**Relief**:  For all the reasons explained above, Plaintiff errs in invoking the specter of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), to urge the Court to hear its case and grant it relief. Dkt. 19 at 6. Federal courts have a duty "to say what the law is" and to give "every injury its proper redress," *Marbury,* 5 U.S. at 147, 177, but "only when" they are "*assured*" that they have "the power to do so, that is, when … called upon to resolve an actual case or controversy." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464,

6

476 n.13 (1982) (emphasis added). Article III's requirements, including standing, "serve[] to prevent the judicial process from being used to usurp the powers of the political branches, and confine[] the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016) (citations and quotation marks omitted). Plaintiff asks the Court to transgress these constitutional safeguards by seeking relief without any concrete, redressable injury.

## II.    Plaintiff Does Not State A Claim Based On The Department's Failure To Issue An Advisory Opinion

### A.    The Department's Failure to Issue an Opinion Is Not a Final Agency Action

Much like the Complaint, Plaintiff's Opposition falls well short of showing that the Department's failure to issue an advisory opinion both determines rights or obligations and represents a consummated agency decision. The Department's conduct therefore does not qualify as a final agency action subject to APA review under 5 U.S.C. § 706(2).

***Does Not Determine Rights or Obligations***: Plaintiff ignores that all the reasons that foreclose its standing equally show that the absence of an advisory opinion does not determine its rights or obligations. The Consortium simply accuses the Department of eliding the two inquiries, Dkt. 19 at 13, without acknowledging the obvious overlap between assessing a plaintiff's injury in fact from government conduct and assessing whether that conduct imposes some legal consequences on the plaintiff. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 79–80 (D.D.C. 2003) (holding that because agency action did not "alter the legal regime and have a discernable coercive effect" for purposes of finality, plaintiffs also lacked an injury in fact and a ripe challenge under Article III), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005). (Plaintiff implicitly concedes this overlap by relying on its alleged economic injuries to show finality. Dkt. 19 at 14.)

Plaintiff further ignores the wealth of case law establishing that finality does not exist simply because, as it repeatedly asserts, agency inaction allows legal uncertainty and risk to

continue.   Dkt. 14 at 33–34 (collecting cases).   Plaintiff cannot avoid this case law by characterizing its advisory opinion request as "seek[ing] safe harbor from ERISA's fines and … EBSA's enforcement priority on MEWAs."  Dkt. 19 at 13.   The Department's inaction simply maintains the status quo; it does not affirmatively deny or withdraw a regulatory safe harbor that would limit "agency employees' discretion" in exercising the Department's plenary authority to enforce ERISA requirements, and that would allow Plaintiff to avoid any ERISA liability.  *Texas v. EEOC*, 933 F.3d 433, 443 (5th Cir. 2019); *see also, e.g.*, *Forusall, Inc. v. U.S. Dep't of Lab.*, No. 22-cv-1551, 2023 WL 5559682, at *8, 10 (D.D.C. Aug. 29, 2023) (Department's Compliance Assistance Request, which described its position on risks associated with cryptocurrency investments and reminded plans of ERISA duties, was not final agency action because it resembled advice letter, did not change legal status quo, and did not compel agency enforcement or any plan conduct).  For this reason, *Data Marketing Partnership, LP v. U.S. Department of Labor*, 45 F.4th 846 (5th Cir. 2022), is readily distinguishable.  The *Data Marketing* court reasoned that an *issued* advisory opinion, which found that a plan was not covered by ERISA, determined rights and obligations because the requestor could rely on the opinion and the opinion thus "bound the Department to some degree and withdrew its previously held discretion."  *Id.* at 854.  The lack of an advisory opinion, by contrast, does no such thing.

In any event, Plaintiff needs no safe harbor to protect any rights or avoid any obligations since, as discussed, it faces no credible enforcement threat in the absence of an advisory opinion. Plaintiff claims no "unusual hardship" caused by the lack of an advisory opinion, Dkt. 19 at 13 (quoting marks omitted, quoting *Data Mktg.*, 45 F.4th at 855), and it even admits that it does not need an advisory opinion to continue to operate as it always has done, *see id.*[3]  In Plaintiff's own

---

[3] Although *Data Marketing* quotes the phrase "unusual hardship" from ERISA Procedure 76-1, 45 F.4th at 855

words, it has "structured" its MEWA and Plan "in line with" prior guidance.  *Id.* at 15.

Finally, Plaintiff errs in attempting to distinguish *Virginia Beach Policemen's Benevolent Ass'n v. Reich*, 881 F. Supp. 1059 (E.D. Va. 1995).  The case is directly on point.  The district court there held that the Department's refusal to issue an advisory opinion did not determine rights or obligations because, like here, such inaction "does not subject the [Plaintiffs'] Plan to new laws or regulations" or "directly jeopardize[] the daily operation of Plaintiffs' business," and has instead "simply maintained the status quo."  *Id.* at 1065–66.  Plaintiff purports to distinguish its case from *Virginia Beach* by arguing that this case "does not present a situation where the government is proposing a new regulation in an area previously untouched by the administrative state."  Dkt. 19 at 14.  But the fact that Plaintiff faces no new regulation because of the Department's inaction, and can simply continue to rely on the previously "recognized" Pathway 1 for single-plan MEWAs, *id.*, totally undercuts, rather than supports, its finality argument.

Plaintiff's failure to plausibly allege this finality prong represents an independent basis to dismiss its suit.  *See, e.g.*, *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 615–19 (7th Cir. 2003); *Sierra Club v. EPA*, 955 F.3d 56, 65 (D.C. Cir. 2020).

***Not the Consummation of the Agency's Decisionmaking Process***:  In its Opposition, Plaintiff disregards the plain language of the Department's email responses and the Complaint's characterization of those responses, both of which clearly indicate that the Department has not completed its advisory opinion decisionmaking process.  Dkt. 14 at 29, 31.  By stating that it could

---

(quoting ERISA Procedure 76-1 § 5.03, 41 Fed. Reg. 36,281, 36,282 (Aug. 27, 1976)), the facts alleged here do not support any suggestion of "unusual hardship."  As ERISA Procedure 76-1 § 5.03 explains, "[p]ending the adoption of regulations (either temporary or final) involving the interpretation of the application of a provision of the Act, consideration will be given to the issuance of advisory opinions" only if, *inter alia*, unusual hardship to the plan or its participants will result from the lack of an advisory opinion, and the advisory opinion requester submits "a separate letter setting forth the facts necessary" to determine any unusual hardship.  In other words, ERISA Procedure 76-1 simply states that an advisory opinion requester can attempt to prove unusual hardship to the Department by a separate letter.  Plaintiff has made no effort to do so.

not "formally address" Plaintiff's opinion request in a published opinion merely "for the time being," and offering to keep Plaintiff's opinion request open in the meantime, the Department has indicated that it is only temporarily holding off on issuing an advisory opinion. *Id.* at 31 (quoting Dkt. 13-2 at 2). Plaintiff ignores this language, and the plethora of cases holding that agency actions are *not* final when they are (1) tentative and nonbinding determinations; (2) mere postponements of a decision; (3) do not involve substantive analysis; (4) produce no reviewable result and instead maintain the status quo; and/or (5) remain subject to further consideration. *Id.* at 30–32 (citing cases). The Department's email responses bear *all* these hallmarks of nonfinality.

Further bolstering the lack of finality here is that, since before Plaintiff's opinion request, the Department has been reconsidering the criteria for MEWA coverage under ERISA—criteria that naturally will dictate the substantive answer to Plaintiff's request. *Id.* at 19–20, 30–31. The Department is in the midst of rulemaking to withdraw, or withdraw and replace, its 2018 final rule on MEWA coverage. *Id.* at 19–20. As the Department identified, this parallel administrative process bolsters a finding that the Department has not reached a consummated result. *Id.* at 31.

Plaintiff refuses to reckon with the Department's forthcoming rulemaking on MEWA coverage. It states in conclusory fashion that the "rulemaking has no bearing on this issue." Dkt. 19 at 12. But of course it does. The Department has indicated that the rulemaking "will reevaluate the criteria for a group or association of employers to be able to sponsor a multiple employer group health plan." Office of Information and Regulatory Affairs, Office of Management and Budget, Reginfo.gov, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=1210-AC16 (Spring 2023 Regulatory Agenda); *see* Dkt. 14 at 19–20. Plaintiff seeks to sponsor such a plan, and the rulemaking's criteria reevaluation therefore directly bears on Plaintiff's opinion request. It is well established that evidence of ongoing and forthcoming administrative action

shows nonfinality, as reflected in the analysis of many cases cited by the Department.  *See, e.g.*, *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (cited at Dkt. 14 at 32); *Dhakal v. Sessions*, 895 F.3d 532, 540–41  (7th Cir. 2018) (cited at Dkt. 14 at 30); *Va. Beach*, 881 F. Supp. at 1065 n.8 (cited at Dkt. 14 at 31); *see also, e.g.*, *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 194 (D.C. Cir. 2011) (decision not to address greenhouse gas emissions in new source performance standards was not final action because EPA indicated it was "working towards a proposal" for such standards); *Util. Air Regul. Grp. v. EPA*, 320 F.3d 272, 278 (D.C. Cir. 2003) (similar).  Plaintiff does not acknowledge these cases, except to argue that the Department's reliance on just one of them, *Virginia Beach*, "is misplaced" because the court there did not specifically credit the Department's intention to engage in rulemaking as part of its nonfinality holding.  Dkt. 19 at 12. Yet that was a fact-specific determination:  The *Virginia Beach* court decided that the proposed rulemaking at issue "[was] somewhat discredited" by the fact that it appeared almost a year after the litigation began.  881 F. Supp. at 1065 n.8; *see id.* at 1065 (also noting that Department had for years consistently refused to issue any advisory opinions on particular MEWA coverage at issue). Plaintiff offers no comparable reason to discredit the Department's forthcoming rulemaking here; the rulemaking notice preceded this litigation, and the Spring 2023 Regulatory Agenda reflects the agency's continued efforts toward that rulemaking.  Dkt. 14 at 19–20, 22.  Nor does Plaintiff offer any reason why the Court should disregard *Virginia Beach*'s general recognition that forthcoming rulemakings "ostensibly favor[]" a finding of nonfinality.  881 F. Supp. at 1065 n.8.

Rather than seriously engage with the Department's arguments and case law support, Plaintiff chooses instead to erroneously rely on a handful of inapt cases, Dkt. 19 at 10–13:  *Data Marketing*, 45 F.4th 846, as well as *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016), *Sackett v. EPA*, 566 U.S. 120 (2012), *Abbott Laboratories v. Gardner*, 387 U.S. 136

(1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977).

*Data Marketing*, 45 F.4th 846, is once again readily distinguishable, because the case concerned the finality of an *issued* advisory opinion. As Plaintiff notes (Dkt. 19 at 11), the *Data Marketing* court held that an issued opinion on a plan's ERISA coverage consummated the Department's decisionmaking, even though the Department "can *change its position* or its reasons for the decision *after more factfinding*," because that possibility does not "change th[e] fact" that the Department arrived at a decision in its issued opinion. *Id.* at 854 (emphases added). But, by contrast, the crux of *this* suit is that the Department has not reached a position at all on Plaintiff's ERISA coverage or engaged in any factfinding. That makes *Data Marketing* irrelevant here.

Moreover, whether or not a published advisory opinion consummates an agency's decisionmaking is not outcome determinative here. Although the Department maintains that an issued opinion does not complete agency decisionmaking, that the weight of circuit authority supports this conclusion, and that this authority logically reinforces the nonfinality of an unissued opinion, Dkt. 14 at 32–33, the Department need not prevail on any or all these arguments to prevail on its Motion to Dismiss. The Department is entitled to a dismissal based on the simple fact that Plaintiff never explains how the *lack* of an advisory opinion either (1) represents a definitive and substantive agency order, regulation, determination, or other consummated result, *id.* at 30 (collecting cases, including *Bd. of Trade of City of Chicago v. SEC*, 883 F.2d 525, 530 (7th Cir. 1989)), or (2) determines reporting or other ERISA obligations, rather than having precisely the opposite effect by maintaining the status quo, *id.* at 33–36 (collecting cases, including *Perrigo Rsch. & Dev. Co. v. U.S. Food & Drug Admin.*, 290 F. Supp. 3d 51, 63 (D.D.C. 2017), and *Va. Beach,* 881 F. Supp. at 1065–66).

*Hawkes*, *Sackett*, and *Gardner* are all distinguishable on this score. They each addressed

definitive and substantive agency conduct that created binding legal obligations, and thus by contrast illustrate why no finality exists here.

*Hawkes* concerned an "approved," rather than "preliminary" (*i.e.*, "merely advis[ory]") Army Corps jurisdictional determination under the Clean Water Act that plaintiffs' property contained "waters of the United States," and that plaintiffs therefore had to obtain a permit before discharging pollutants. 578 U.S. at 594–95 (quotation marks omitted). The Court held that these determinations (1) consummate agency decisionmaking because they are "issued after extensive fact-finding" and are "typically not revisited," and (2) have direct legal consequences because they "bind" the agency for five years and, for this time, expose property owners who discharge pollutants without a permit to "significant criminal and civil penalties" by affirmatively denying them a safe harbor from liability. *Id.* at 597–600. The Court also noted that agency regulations defined approved determinations as final. *Id.* at 598. By contrast, ERISA Procedure 76-1 contains no such definition. And the Department's failure to issue an advisory opinion did not stem from any factfinding, is only temporary, and does not bind the agency's enforcement, expose Plaintiff to significant liability, or affirmatively deny Plaintiff an available safe harbor. Even assessing finality through a "pragmatic" lens, as *Hawkes* instructs, *id.* at 599; *see* Dkt. 19 at 10, the absence of an opinion here is not final because the agency has not "made its record and articulated findings" or done anything to affect Plaintiff, *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 494 (7th Cir. 2023) (distinguishing *Hawkes* on this basis).

Similarly, *Sackett* concerned an administrative compliance order that determined that plaintiffs had violated the Clean Water Act by placing fill material on their property and directed them to restore their property pursuant to an EPA work plan. 566 U.S. at 122. The Court determined that the order consummated the agency's decisionmaking because it was "not subject

to further [a]gency review," and that the order created legal obligations by requiring plaintiffs to restore their property, exposing them to double penalties in future proceedings, and limiting their ability to obtain government permits for their fill.  *Id.* at 126–27.  Plaintiff's suit differs on each of these fronts.  Plaintiff does not challenge a Department order.  Nothing prohibits the Department from engaging in the "further … review" to which it has expressly left the door open (*i.e.*, by offering to keep Plaintiff's request open while the MEWA rulemaking and related litigation play out).  Dkts. 13-2 at 2, 14 at 31–32.  And the lack of an advisory opinion does not direct Plaintiff to do anything or limit its ability to operate in any way.  Dkts. 13-2 at 2, 14 at 26, 29, 34, 36.

Finally, *Gardner* concerned an FDA regulation, issued after notice and comment, that required prescription drug materials to designate the established name of the particular drug every time its trade name was used.  387 U.S. at 138.  Plaintiff makes no attempt to argue that the Department's failure to issue an advisory opinion is similar to a published regulation.

### B.      Plaintiff Cannot Plead a Final Agency Action as an End Run Around Its Inability to Plead Impermissible Agency Inaction

Plaintiff ignores that a suit such as this one, challenging an agency's failure to act, is more appropriately brought under 5 U.S.C. § 706(1).  Dkt. 14 at 37–38.  But a suit under § 706(1) would inevitably fail because, as discussed, the Department has unbounded discretion to decide whether an advisory opinion should be issued and on what timetable.  Dkt. 14 at 37–42; *infra* pp. 14–19.  Plaintiff should not be allowed to plead around this core flaw simply by characterizing the Department's decision not to resolve its opinion request as the functional equivalent of a final decision deciding the merits of the request against it, in a manner that has legal consequences.  A decision not to decide a request is different from a decision to deny the specific opinion requested.

### C.      The Department's Decision Is Committed to Agency Discretion by Law

Plaintiff concedes that the Department's refusal to issue an advisory opinion is

"discretionary." Dkt. 19 at 14. That is no surprise, given the broad language in ERISA Procedure 76-1 stating unequivocally that the Department has "[d]iscretionary [a]uthority to [r]ender [a]dvisory [o]pinions," "answer inquiries … whenever appropriate, and in the interest of sound administration of the Act," and therefore "may decline to issue advisory opinions … whenever warranted by the facts and circumstances of a particular case." ERISA Procedure 76-1 §§ 2, 5. Plaintiff's attempts to circumvent this expansive language, and the committed-to-agency-discretion exception to review of APA claims under 5 U.S.C. § 701(a)(2), are each unavailing.

Plaintiff first flips the committed-to-agency-discretion exception on its head. It relies on a case not brought under the APA to argue that the Court may "review[]" an agency "discretionary decision" if "it rests on an explicit error of law or other egregious error." Dkt. 19 at 14 (quoting *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001)). In other words, Plaintiff seeks to import a "clear error" standard into § 701(a)(2), and to avoid dismissal under the exception by arguing that the Department made an explicit mistake and egregiously erred in refusing to issue an advisory opinion. Dkt. 19 at 16. But whether agency conduct is clearly erroneous (or is "arbitrary and capricious," as Plaintiff's sole APA claim alleges, Dkt. 1 at 9 (¶ 41)) under the APA represents a second-order merits question governed by § 706(2) (laying out different standards of review to set aside agency action)—one typically resolved on summary judgment. *See, e.g.*, *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008). It is therefore separate from the first-order question whether, under § 701(a)(2), Plaintiff can avoid dismissal for failing to state a claim by identifying a "judicially manageable standard" by which to assess the Department's exercise of discretion in the first place. *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072 (7th Cir. 2020); *cf. Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (explaining that plaintiff could not substitute in the "substantial evidence" "standard of review"

for the "existence of law to apply," and that "confus[ing]" the two and accepting the former "as a basis to review" agency action would mean that "there would be 'law to apply' in every agency action" and § 701(a)(2) would be "meaningless"); *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003) (similar).  On this operative question, Plaintiff falls well short of the mark.

Plaintiff fails to identify any judicially manageable standard for when the Department should exercise its discretion to issue, withhold, or delay issuing an advisory opinion.  Instead, Plaintiff selectively quotes ERISA Procedure 76-1 in two ways, but neither establishes the standard necessary to permit review.

*First*, Plaintiff highlights the procedure's introduction stating that the Department's practice is "to answer inquiries of individuals or organizations affected" by ERISA, Dkt. 19 at 3, 15 (quotation marks omitted).  But it never acknowledges that the procedure's "General Practice" and "Discretionary Authority to Render Advisory Opinions" sections broadly state that Department "answer[s] inquiries … *whenever appropriate*, and in the interest of sound administration of the Act," and therefore "*may decline to issue advisory opinions … whenever warranted* by the facts and circumstances of a particular case."  ERISA Procedure 76-1 §§ 2, 5 (emphases added).  In other words, nothing constrains the Department's ability to decide to withhold an opinion any time it determines that no response would be warranted.  *Cf. Doe v. McAleenan*, 926 F.3d 910, 913 (7th Cir. 2019) ("It's hard to imagine a clearer grant of discretion" than language granting agency head power to, "at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition," and "no standard" exists to test good and sufficient cause (quotation marks omitted)).  Plaintiff's Opposition offers no answers for how the Court can assess when issuing an advisory opinion would be appropriate and consistent with the agency's administration of ERISA, or when declining to issue one would not be warranted in any

given circumstance.  Nor does it address how the Department has previously exercised its broad discretion to decline requests on several occasions, without legal challenge.  Dkt. 14 at 39 & n.10.

*Second*, Plaintiff highlights the assertion in ERISA Procedure 76-1 § 5.03(a) that "[i]f an inquiry presents an issue on which the answer seems to be clear from the application of the provisions of the Act to the facts described, the advisory opinion will be issued in accordance with the procedures contained herein."  Dkt. 19 at 15 (quoting marks omitted).  Yet Plaintiff fails to acknowledge that immediately preceding this language, the procedure states that "[p]ending the adoption of regulations … involving the interpretation of the application of a provision of the Act, *consideration will be given* to the issuance of advisory opinions."  ERISA Procedure 76-1 § 5.03 (emphasis added).  In other words, the procedure indicates merely that the Department can *consider* issuing an opinion during pending rulemaking but is not obligated to do so, and that if it decides to issue an opinion because it determines the opinion answer is "clear," the opinion issues *under the normal procedures*—without necessitating a separate submitted letter detailing unusual hardship or emergencies when the answer is "not entirely free from doubt," as laid out in § 5.03(b).

Setting aside this interpretive flaw in Plaintiff's argument, Plaintiff does not describe how the Court can assess whether an advisory opinion answer "seems to be clear" or not.  By simply describing its own request as "not overly complicated" and devoid of "unusually novel circumstances," Plaintiff at best asks the Court to adopt a know-it-when-you-see-it approach to assess clarity.  Dkt. 19 at 15.  And, at worst, Plaintiff invites the Court to ignore the Department's expertise—on what are indisputably "factually specific" ERISA coverage questions within the agency's purview, *id.*; *see* Dkt. 14 at 14, 40—and substitute *unguided* judicial judgment for when the Department should and should not issue discretionary opinions.  That judgment would be unguided because, regardless of whether or not an advisory opinion answer is clear, Plaintiff does

not and cannot explain how the Court can evaluate whether the Department inappropriately exercised its expansive discretion to "*decline to issue advisory opinions … whenever warranted* by the facts and circumstances of a particular case." ERISA Procedure 76-1 § 5 (emphasis added). That limitless grant of discretion compels dismissal under § 701(a)(2).

Beyond failing to actually grapple with the text of ERISA Procedure 76-1, Plaintiff's Opposition further ignores the facts as alleged and the harmful consequences of forcing the Department to exercise its discretionary authority here. Both considerations independently support applying § 701(a)(2). Plaintiff ignores that the Department temporarily declined to issue an advisory opinion here not only because such an opinion could impact the pending *New York* litigation, Dkt. 19 at 2, 4, 10, 16, but also because the regulatory actions the Department is considering could affect MEWA coverage generally, including under the pre-2018 subregulatory guidance through which Plaintiff seeks coverage. Dkts. 13-2 at 2, 14 at 21, 41. No basis in law exists for the Court to question this determination, which implicates a "complicated balancing of … factors" that Plaintiff disregards—*e.g.*, "whether agency resources are best spent on" an opinion request that could be rendered obsolete by impending rulemaking; whether the request "fits the agency's overall" priority of reevaluating MEWA criteria; and "whether the agency has enough resources" to devote to the request and any complications arising from it in related litigation or rulemaking. *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985). This "complicated" set of factors makes Plaintiff's opinion request far from "clear." And it illustrates why Plaintiff's suit contravenes § 701(a)(2) and the provision's animating concerns for safeguarding agencies' expertise and their administration of the statutes they are charged with implementing. *Id*. By seeking judicial review here, Plaintiff asks the Court to police the Department's determinations of ERISA regulatory priorities, and to effectively turn the discretionary advisory opinion process into

a mandatory, hugely burdensome task.  Dkt. 14 at 41–42.  Plaintiff never explains why it should be allowed to thwart § 701(a)(2) in this fashion.[4]

### III.     Plaintiff Is Not Entitled To Declaratory Or Injunctive Relief

Plaintiff never explains how it is entitled to declaratory relief.  To begin with, Plaintiff fails to address the fundamental principle that the APA only permits courts that find agency action to be unlawful to set that action aside and remand the case to the agency.  Dkt. 14 at 42–43.  It also fails to address that the Declaratory Judgment Act is procedural, not substantive, and therefore presupposes a predicate cause of action.  *Id.* at 43.  The Department has not, as Plaintiff argues, simply "erroneously assume[d] that [Plaintiff]'s substantive APA claim fails."  Dkt. 19 at 16.  Rather, the Department has pointed out that Plaintiff cannot simply plead declaratory relief under the Declaratory Judgment Act; such relief "is a remedy, not a cause of action, and thus should not be pleaded as a separate count," and it cannot be available when, as here, "plaintiff[] fail[] to state" an underlying claim.  *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019).

For similar reasons, Plaintiff does not and cannot demonstrate that it is entitled to injunctive

---

[4] The Court can also dismiss Plaintiff's claim for failing to plausibly allege any arbitrary-or-capricious conduct, without any need to proceed to summary judgment.  *See, e.g.*, *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225–26 (D.C. Cir. 1993) (where the dispute only concerns "arguments about the legal conclusion to be drawn about the agency action," the district court, "sit[ting] as an appellate tribunal" in APA cases, "can fully resolve any purely legal question on a motion to dismiss" and faces "no inherent barrier to reaching the merits at the 12(b)(6) stage").  According to Plaintiff, the Department's explanation that the pending *New York* case prevented the agency from issuing an advisory opinion is "inconsistent" with the "formal guidance" in 2019 that the "case does not affect Pathway 1 MEWAs."  Dkt. 1 at 8–9 (¶ 41); *see also* Dkt. 19 at 5 (similar).  But Plaintiff identifies no inconsistency, because it fails to fully address the Department's explanation.  *See McMaster v. United States*, 731 F.3d 881, 892 n.5 (9th Cir. 2013) ("Agency inconsistency is 'at most' a reason for concluding that an action is arbitrary and capricious only when the change in position is inadequately explained." (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005))).  The Department stated in response to Plaintiff's advisory opinion request that potential regulatory actions reevaluating MEWA coverage *may* implicate Pathway 1.  Dkts. 13-2 at 2, 14 at 21, 41.  It is not arbitrary or capricious for the Department to hold off on issuing the opinion under these circumstances, particularly where the agency has discretion to "decline to issue advisory opinions … whenever warranted by the facts and circumstances of a particular case."  ERISA Procedure 76-1 § 5; *see Cardoza v. Commodity Futures Trading Comm'n*, 768 F.2d 1542, 1552–53 (7th Cir. 1985) (affirming 12(b)(6) dismissal where Plaintiff failed to show that agency exercised its discretion in arbitrary and capricious fashion); *Marshall*, 988 F.2d at 1225–27 (same).

relief under 29 U.S.C. § 1132(k).  Again, Plaintiff cannot simply plead injunctive relief as a count in its Complaint.  It is not entitled to a free-standing injunction barring the Department from issuing an adverse advisory opinion.  And because Plaintiff never explains how the Department expressing its view on an ERISA coverage question is itself "contrary to the provisions of" ERISA, it cannot rely on § 1132(k).  Dkt. 14 at 44–45.  Moreover, § 1132(k) cannot reasonably be construed to permit entities associated with ERISA plans to sue preemptively anytime they expect to disagree with the Department's advisory opinion views.  Plaintiff cites no case adopting such an extraordinary reading of 1132(k)'s narrow waiver of sovereign immunity.

Finally, Plaintiff's reliance on *Data Marketing* is once again misplaced.  As explained, that case concerned an already-issued advisory opinion, not the Department's failure to issue one or its intentions as to a forthcoming one.  The propriety of the Department's ERISA coverage interpretation in an issued opinion and the district court's ability to enjoin that interpretation— what was and continues to be at issue in *Data Marketing*—says nothing about the Court's power *in the absence of an opinion* to, as Plaintiff requests, "determine the law of ERISA, apply it to the facts of the case in front of it, or enjoin the Department from acting in a contrary manner."  Dkt. 19 at 17.  Nothing in the district or appellate court analysis in *Data Marketing* would permit the Court to grant Plaintiff's unprecedented requests.  Plaintiff identifies no case allowing the Court either to step into the Department's shoes and respond, by judicial decree, to the advisory opinion request on which the Department has not yet acted, or to constrain the Department from even expressing its interpretive view in the first place.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

Dated:  August 30, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ZACHARY A. MYERS
United States Attorney

JULIE STRAUS HARRIS
Assistant Branch Director
Civil Division, Federal Programs Branch

Of Counsel:

*/s/ Yoseph T. Desta*
YOSEPH T. DESTA (CA Bar No. 332179)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: 202-305-3080
Email: Yoseph.T.Desta@usdoj.gov

SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Associate Solicitor for Plan Benefits
Security

KATRINA LIU
Senior Trial Attorney
United States Department of Labor
Office of the Solicitor

GINA M. SHIELDS
Assistant United States Attorney

*Counsel for Defendants*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 30, 2023, the foregoing was filed electronically through

ECF/CM.   On this same date, electronic service will be made to the following counsel of record

through the Court's ECF/CM system:

      Andrew M. McNeil
      Dakota C. Slaughter
      BOSE MCKINNEY & EVANS LLP
      AMcNeil@boselaw.com
      DSlaughter@boselaw.com
      *Attorneys for Plaintiff*

      */s/ Yoseph T. Desta*
      YOSEPH T. DESTA
      Trial Attorney, U.S. Department of Justice